**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BERNARDO ORTIZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 1765** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.** | ) | |
| **and DR. EVARISTO AGUINALDO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Bernardo Ortiz, who is incarcerated in an Illinois Department of Corrections institution, has sued Dr. Evaristo Aguinaldo and Dr. Aguinaldo's employer, Wexford Health Sources, Inc., under 42 U.S.C. § 1983. Wexford provides medical care to IDOC inmates pursuant to a contract with the agency, and during the relevant period, Dr. Aguinaldo was a staff physician at Stateville Correctional Center, where Ortiz was incarcerated. Ortiz contends that he received inadequate care for a serious knee injury due to the deliberate indifference of Dr. Aguinaldo and the policies of Wexford, and that as a result the injury was exacerbated, causing severe pain and further deterioration. Ortiz now requires a full knee replacement, as his knee can no longer be repaired.

The case is set for trial on March 31, 2025. Dr. Aguinaldo and Wexford have moved for summary judgment, and the motion was fully briefed as of January 22, 2025. In considering the motion, the Court views the evidence in the light most favorable to the non-moving party, Ortiz, and draws reasonable inferences in his favor. *See, e.g.,*

*Jones v. Anderson*, 116 F.4th 669, 677 (7th Cir. 2024).

## Background

Ortiz fell while descending a staircase at Stateville on December 7, 2017 and injured his left knee. He experienced pain and swelling, saw a physician's assistant, and was given a permit for crutches as well as a "knee sleeve" to provide compression and support, and was prescribed icing and a pain medication. On December 12, an x-ray was done, which showed no fracture and no other bone or joint pathology.

Ortiz first saw Dr. Aguinaldo on December 22, 2017 and, at that time, complained of ongoing pain in his knee. Records reflect that Dr. Aguinaldo prescribed icing, an increase in Ortiz's pain medication, and a muscle relaxant. In later appointments in January 2018, Dr. Aguinaldo renewed Ortiz's permit for the knee sleeve. In late March 2018, Ortiz saw Dr. Aguinaldo again; records reflect that he again noted tenderness and pain in Ortiz's knee.

And so matters continued, for several more months. Ortiz repeatedly complained of pain in his knee, and he reported on a number of occasions over those months that the knee was popping out or dislocating, complaints that likely were not literally accurate but were indicative of instability, perhaps due to torn or ruptured ligaments. But although the condition of Ortiz's knee does not appear to have improved at all, Dr. Aguinaldo's treatment of the problem did not materially change, for eight months or more.

In or around August 2018, Ortiz was referred for physical therapy. It's not clear who made the referral or exactly when. The records provided by defendants in support of their motion include nothing on this. Worse, the document they cite for the

proposition that as of August 2018 Ortiz was on the waiting list for physical therapy—"WEX1156"—isn't actually included in their summary judgment submission in the spot where they say it should be found, at least not under that document number. *See* Defs.' L.R. 56.1 Stat. ¶ 24 (citing Defs.' Ex. 4). But if Ortiz ended up in physical therapy, *someone* had to make the referral, and it's at least possible that was Dr. Aguinaldo. (Dr. Aguinaldo is no help on this point; during his deposition, he didn't recall any aspect of his treatment of Ortiz.)

All of that aside, what is noteworthy is that physical therapy did not begin until a full *nine months* after Ortiz injured his knee. This was despite the fact that Dr. Aguinaldo's treatment of the injury—if it can be called that—had not led to any improvement in the intervening months. As indicated, the evidence tends to show that Dr. Aguinaldo's treatment of Ortiz's knee did not materially change during that period, despite the fact that Ortiz kept making similar reports of pain and his knee popping out—in other words, despite clear indications that the course of treatment had not helped at all. The Court also notes, in this regard, that Ortiz filed a grievance in mid-May 2018 complaining of inadequate treatment and saying he was having trouble walking, his leg was unstable, and he needed further evaluation. But this does not appear to have had any material effect on the way Dr. Aguinaldo treated the injury.

All told, records reflect that Ortiz was seen by Dr. Aguinaldo on ten or so occasions from late December 2017 through June 2018. Based on the records, some of the visits were not for Ortiz's knee issues but rather for lower abdominal pain. As indicated earlier, Dr. Aguinaldo testified that he has no memory of treating Ortiz. But what is clear is that Dr. Aguinaldo's treatment of Ortiz's knee injury did not materially

change over the six-plus months he saw Ortiz.

There are a couple more interesting facts regarding Dr. Aguinaldo's treatment of Ortiz. In March 2018, Dr. Aguinaldo ordered an x-ray of Ortiz's knee, which was done in April 2018. But Ortiz *already had* an x-ray, in December 2017, days after the injury. The record includes at least some evidence that would permit an inference that when Dr. Aguinaldo placed the March 2018 order, he was unaware that an x-ray had been taken just three months earlier. Indeed, Dr. Aguinaldo, an extremely busy physician to be sure, testified that he *did not look* at an inmate's prior medical records when the inmate had an appointment with him.

There is further evidence of inattention, indifference, and disregard on Dr. Aguinaldo's part. Wexford's medical guidelines, which were discussed during Dr. Aguinaldo's deposition, appear to indicate that for an acute knee injury with no fracture, which was the situation here—the appropriate initial course of treatment involved icing, elevation, anti-inflammatory drugs, pain management, crutches, and "active exercises as tolerated"—which Dr. Aguinaldo testified is a reference to physical therapy. *See* Aguinaldo Dep. at 40-42. Some of that was done, as indicated above. But Ortiz *was not referred* to physical therapy for, it appears, eight full months after his injury, a period during which he was in Dr. Aguinaldo's care. The same guidelines regarding knee injuries also apparently call for a referral to an outside specialist if the inmate is still "symptomatic after 6 weeks." *See id.* at 42-43. Dr. Aguinaldo quite obviously did not do that either, not after 6 weeks or even after 6 months. Indeed, he testified that he wasn't aware of the policy. Even if one acknowledges, as defendants contend, that Dr. Aguinaldo did not have authority to make an outside referral on his own, it is apparent

4

(as Dr. Aguinaldo admitted, *see id.* at 43-44) that he had the authority to refer an inmate to the medical director for consideration of an outside referral—indeed, who else, if not Dr. Aguinaldo, would have been in a position to do so? And yet the evidence does not reflect that Dr. Aguinaldo took even this modest step with regard to Ortiz's knee, at any point during the six-plus months during which Ortiz repeatedly reported continued pain, instability, and lack of improvement.

It appears that Ortiz had eight or so physical therapy sessions from September through November 2018, but this does not appear to have resulted in any material improvement of his condition. Finally, the Wexford medical director at Stateville, Dr. Marlene Henze, saw Ortiz in mid-December 2018, over one year after he had injured his knee. Dr. Henze approved an MRI in early January 2019 and, apparently, an outside consultation, though evidently not with an orthopedic specialist. Later in January 2019, before the MRI was actually scheduled, Ortiz's left knee gave way when he was descending stairs, and he fell again. He dislocated a finger and suffered a low back injury, with pain radiating down his leg.

In April 2019, Ortiz saw a physician at University of Illinois Hospital in Chicago, for both his knee and unrelated abdominal issues. The physician there recommended an orthopedic evaluation. Ortiz had an MRI scan of the knee—finally—in late April 2019, also at University of Illinois Hospital. The MRI showed tears of the meniscus and the anterior cruciate ligament (ACL), considered "nonacute"—unsurprisingly, as sixteen months had passed since his initial injury. The MRI also showed other deterioration in Ortiz's left knee.

Dr. Henze then requested approval for an orthopedic consultation for Ortiz's knee

as well as an MRI on his lower back. A higher-up with Wexford, however, disapproved this request in June 2019. The rationale was that other testing had shown a lesion in Ortiz's small intestine, and there was concern it could be cancerous, so that's where the focus turned.[1] There does not appear to have been any further attention to Ortiz's knee on the part of Wexford until September 2019, when he was seen at the prison infirmary and again complained of knee pain and instability—as he had many times before. Finally, in February 2020, Wexford approved an orthopedic consultation. Then, of course, COVID happened, which likely contributed to further delay. Ortiz continued to complain during infirmary visits of knee pain, his knee "popping out," and swelling, and he continued to use a crutch to get around.

Ortiz did not actually get his orthopedic consultation until June 2021, over three and one-half years after his initial knee injury, and two and one-half years after his second fall. The physician who initially saw him—who, it appears, may have been an intern—reported his impression that Ortiz had an ACL tear as well as medial and lateral tears of the meniscus. That is no surprise; it is what the MRI had shown two years earlier. A hinged brace was recommended for Ortiz's knee, and there was a referral to the orthopedic specialist. But neither of these happened, at least not right away: Ortiz got a patellar sleeve, not a brace, and the visit with the orthopedic specialist did not pan out for reasons that are not clear from the record. Instead, Ortiz kept visiting the prison infirmary, with the same or similar complaints as before. A note in the medical records in September 2021 indicated that Ortiz was waiting for surgery, but it's unclear if this was reported by Ortiz himself or if instead it came from the professional who treated him

---

[1]  The lesion turned out to be benign.

on that date.

More recently, it appears, Ortiz has been approved for a full knee replacement. *See* Pl.'s Resp. to Defs.' Mem. at 3 n.5. This indicates that he *needs* a knee replacement, which in turn indicates that the condition of his knee has deteriorated since his initial injury. That is exactly what an expert retained by Ortiz's counsel reports. More specifically, Ortiz's expert, Dr. Gordon Jones, opines as follows:

> It is my opinion that the withholding of orthopedic treatment for Mr. Ortiz's obvious structural injury to his left knee has resulted in irreversible articular cartilage damage being done to his knee. Initial x-rays showed no evidence of any degenerative changes while his MRI scan 16 months later showed evidence or articular cartilage damage in the medial compartment, the lateral compartment as well as medial and later compartment osteophytes or spurs. In other words, by April of 2019, Mr. Ortiz was already developing irreversible arthritic changes secondary to his instability. These changes would have certainly been prevented had stability been granted to Mr. Ortiz with proper orthopedic care. . . . The time delay of stabilizing care was solely responsible for the further deterioration of his knee and led to the only option being a salvage procedure, total knee replacement.

Pl.'s Ex. 9 at 9. Dr. Jones further opines that the back pain following Ortiz's January 2019 fall—caused when he fell after his knee gave way while on a staircase—also was caused by his untreated knee instability and that "[f]uture treatment of Mr. Ortiz's low back pain and radicular symptoms is directly related to the lack of treatment of his left knee instability." *Id.* at 10. Dr. Jones also opines that the treatment that Ortiz got for his knee was substandard in various ways.

### Discussion

#### A.    Dr. Aguinaldo

Ortiz's claim against Dr. Aguinaldo arises under the Eighth Amendment to the Constitution. Deliberate indifference to an imprisoned person's serious medical needs

violates the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail, Ortiz must establish that he had an objectively serious medical condition and that the defendant was deliberately indifferent to that condition.  *See, e.g., Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024).  It is undisputed for present purposes that Ortiz's knee injury amounted to a serious medical condition.

The issue presented on summary judgment regarding Dr. Aguinaldo concerns whether a reasonable jury could find that he was deliberately indifferent to Ortiz's condition.  This requires Ortiz to establish that Dr. Aguinaldo knew of and consciously disregarded a serious risk to Ortiz's health.  *See id.*  If the evidence demonstrates that a decision, or course of treatment, was based on medical judgment, then there is no deliberate indifference, even if the provider's decisions may be characterized as negligent.  *Id.*  "But where evidence exists that the defendant[ ] knew better than to make the medical decisions that [he] did, a jury should decide whether or not the defendant[ ] [was] actually ignorant to the risk of harm that [he] caused."  *Id.* (cleaned up).  This may include evidence of "the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards."  *Id.* at 635-36.

Ortiz's claim against Dr. Aguinaldo clears this threshold.  A reasonable jury could find that Dr. Aguinaldo—who by his own admission did not even look at his patients' prior treatment records when they came to see him—put his head in the sand and persisted in the same treatment for Ortiz's knee despite evidence repeatedly made available to him indicating that the treatment was having no effect.  The evidence also would permit a finding that Dr. Aguinaldo was ignorant of, and/or disregarded, his

employer's own guidelines in his treatment of Ortiz's knee injury. At the summary judgment stage at least, this is case of a mere difference of opinion regarding the application of medical judgment. Rather, a reasonable jury could find that Dr. Aguinaldo effectively did not apply medical judgment at all, at least not before serious damage had been done as a result of his indifference, and that his indifference qualifies as at least reckless disregard.

Defendants argue, citing *Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911 (7th Cir. 2020), that Dr. Aguinaldo's claim during his deposition that he applied medical judgment is the end of the story and that *Murphy* compels this result. *See* Defs.' Mem. at 8-9. That's nonsense: it mischaracterizes both the evidence and *Murphy*. As indicated earlier, Dr. Aguinaldo doesn't remember a thing about his treatment of Ortiz. The best he could do was to say, generally speaking, that he applies medical judgment in treating patients. That testimony doesn't get him a pass under *Murphy. Murphy* does not say that so long as a prison physician testifies that he exercised medical judgment, a deliberate indifference claim fails. Rather, the physician's testimony was just one item of evidence the Seventh Circuit cited in support of its conclusion in that case. *See id.* at 916. Nothing in the court's decision suggests that, as defendants seem to contend, a physician's intonement of the phrase "medical judgment" is enough to end a lawsuit. If that were the case, we would not even need courts, let alone juries.

Based on the evidence presented, it is genuinely disputed in this case *whether* Dr. Aguinaldo exercised, or applied, medical judgment in his treatment decisions regarding Ortiz's knee. A reasonable jury could find that he did not and that he was deliberately indifferent, and that this caused further injury to Ortiz.

9

Dr. Aguinaldo also relies on proposition that it's undisputed that there was nothing more he could do other than offer day-to-day care. That's inaccurate. Certainly Dr. Aguinaldo can argue to a jury that pushing for more and different treatment for Ortiz was above his pay grade, but a jury could find otherwise. At a minimum, a reasonable jury could find that Dr. Aguinaldo could have brought Ortiz's case to the medical director's attention *way* earlier, reporting on Ortiz's lack of improvement. Perhaps the contention is that, as is typically the case with orthopedic injuries, "conservative" treatment has to be tried and has to fail before surgery is ordered or perhaps even before an MRI is ordered. But the evidence appears to reflect that Dr. Aguinaldo waited *six months or more* before even referring Ortiz for physical therapy, which by his own testimony and under Wexford's guidelines would have been a key part of that conservative treatment. There is nothing in the record to suggest that Dr. Aguinaldo could not have done that far sooner. And there is plenty to indicate that he should have, given Ortiz's repeated reports of pain as well as his knee "popping out," "dislocating," and instability, which a jury could find were signs of a more serious injury than one appropriately treated just by prescribing anti-inflammatories or muscle relaxants and giving the patient a crutch.

For these reasons, Dr. Aguinaldo is not entitled to summary judgment.

**B.      Wexford**

Ortiz's claim against Wexford requires him to establish that a policy, custom, or establish practice of Wexford caused his injury. More specifically,

> A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. To demonstrate that the [defendant] is liable for a harmful custom or practice, the plaintiff

10

> must show that [the defendant's] policymakers were deliberately indifferent
> as to [the] known or obvious consequences. In other words, they must
> have been aware of the risk created by the custom or practice and must
> have failed to take appropriate steps to protect the plaintiff. Therefore, in
> situations where rules or regulations are required to remedy a potentially
> dangerous practice, the [defendant's] failure to make a policy is also
> actionable.

*Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 302–03 (7th Cir. 2010) (internal

quotation marks and citations omitted).

Defendants' first argument is that Wexford's liability depends on Dr. Aguinaldo's

and thus that the claim against Wexford fails because the claim against Dr. Aguinaldo is

infirm. It isn't, as the Court just ruled. But that aside, the Seventh Circuit has made it

clear that "an organization might be liable even if its individual agents are not. Without

the full picture, each person might think that her decisions were an appropriate

response to a problem; her failure to situate the care within a broader context could be

at worse negligent, or even grossly negligent, but not deliberately indifferent. But if

institutional policies are themselves deliberately indifferent to the quality of care

provided, institutional liability is possible." *Glisson v Ind. Dep't of Corrs.*, 849 F.3d 372,

378 (7th Cir. 2017) (en banc).

In assessing the claim against Wexford, it is helpful to look at it in two phases:

the period when Dr. Aguinaldo was treating Ortiz, and the period after that. Starting with

the first, it is difficult to see how Dr. Aguinaldo's indifference may be lain at the feet of

any Wexford policy or practice. As indicated earlier, Dr. Aguinaldo's treatment of Ortiz

arguably *contravened* Wexford's written policies for treating knee injuries. Ortiz

contends that it is Wexford's policies that cause staff physicians like Dr. Aguinaldo to

see themselves as mere "symptom treaters" unconcerned with addressing the causes

of an inmate's medical problems and, perhaps, that led Dr. Aguinaldo to his apparent practice of not reviewing a patient's previous treatment notes and history when seeing him. But Ortiz points to no evidence that would show such a connection. This aspect of his claim against Wexford falls short from a "policy" standpoint.

The second phase of Ortiz's claim against Wexford involves the very long delays between Dr. Henze's involvement in his case in December 2018 and the MRI of Ortiz's knee, which took place in April 2019, and the orthopedic consultation at University of Illinois Hospital, which did not take place until June 2021. The evidence would permit a finding that Ortiz was injured as a result of these delays. And the record reflects that the delays were due at least partly to decisions by higher-ups at Wexford, including the determination to put off dealing with Ortiz's knee until the situation with his small intestine was cleared up. But a decision by a higher-up is not necessarily indicative of a policy of the entity by which the higher-up is employed. In this case, Ortiz has not attempted to show that those who made the decision not to approve an orthopedic referral on the first go-round, or delayed it on the second, or made the determination to de-prioritize treatment of Ortiz's knee while dealing with his abdominal issue, were "policymakers" in the *Monell* sense.

Nor has Ortiz cited evidence that would permit a reasonable jury to find that these decisions, or the delays in his treatment, were made pursuant to any sort of a policy or established custom at Wexford. In this regard, the filing of other lawsuits and the existence of news articles chronicling delayed and denied treatment by Wexford— both of which Ortiz references—do not amount to admissible evidence of a policy. That aside, Ortiz has not offered evidence that the decisions and the delay resulted from a

12

policy or custom of Wexford, as opposed to being individualized determinations (albeit poor ones) in his case.

In addition, this is not a situation in which the existence of a policy reasonably may be inferred from how Ortiz's specific situation was handled. First of all, there is law indicating that a single incident is insufficient to permit an inference of actions pursuant to an entity's custom or practice. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (in cases involving *Monell* "claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy," "the claim requires more evidence than a single incident to establish liability."). And even if there are situations in which a single event is indicative of a common or widespread practice, there is nothing about the way Ortiz's case was handled that would allow a reasonable inference along these lines. As the Seventh Circuit has stated, "[t]he critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson*, 849 F.3d at 381. In this case, Ortiz has pointed to nothing that would permit a reasonable inference that it was the former rather than the latter.

### Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment [138] with regard to plaintiff's claim against Wexford Health Sources, Inc. but denies the motion with regard to plaintiff's claim against Dr. Evaristo Aguinaldo. The final pretrial order is to be filed by March 11, 2025. The final pretrial conference is set for March 25, 2025 at 3:00 p.m. The case remains set for a telephonic status hearing

on February 14, 2025 at 9:25 a.m., as previously ordered, to discuss logistical issues relating to the March 31, 2025 jury trial.

Date:  February 10, 2025

MATTHEW F. KENNELLY
United States District Judge